IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENNETH E. HADDOCK,

                    Petitioner,

          v.                          CASE NO.  13-3038-SAC

RAY ROBERTS, Secretary
of Corrections, et al.,

                    Respondents.

<u>**MEMORANDUM AND ORDER**</u>

This case is before the court upon petitioner's application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. For the reasons explained in this order, the requested relief shall be denied.

I.  PRIOR PROCEEDINGS

In 1993, a Kansas state court jury found that petitioner killed his wife Barbara Haddock and convicted him of first degree murder.  His conviction was affirmed by the Kansas Supreme Court.  <u>State v. Haddock</u>, 897 P.2d 152 (Kan. 1995)("<u>Haddock I</u>").  After this decision, petitioner filed a petition for state habeas relief, pursuant to K.S.A. 60-1507, and also filed at least two motions for postconviction DNA testing and for relief pursuant to such testing.  One motion concerned testing of:  hair found in the victim's hand; the victim's eyeglasses; and fingernail scrapings from the victim.

1

A second motion concerned testing of blood found on the shoes, slacks and a shirt belonging to petitioner.

The postconviction testing of the hair revealed that it was from a female other than the victim; the testing of the fingernail scrapings showed that the scrapings contained the victim's DNA; the testing of the eyeglasses showed DNA consistent with the victim and from a male source inconsistent with petitioner.  The trial court found that these results were "inconclusive" and therefore refused petitioner's request to order a new trial.  The trial court further found that there was no issue before it as to the testing of the shoes, shirt and slacks because the petitioner had refused to submit to further DNA testing.

On the appeal of these postconviction rulings, the Kansas Supreme Court held that the trial court had committed an error in the analysis of both postconviction DNA test motions. Haddock v. State, 146 P.3d 187 (Kan. 2006)("Haddock II").  The court found that the analysis of the hair, glasses and fingernail scrapings were "favorable" to petitioner, not "inconclusive," and that the trial court erred by not making a finding as to the results of the testing on the shoes, shirt and slacks.  The court remanded the case back to the trial court for further consideration of whether the additional DNA testing

warranted a new trial, although the court observed that the end result could depend upon whether petitioner chose to proceed with further DNA testing on the shoes and shirt because the evidence at trial from the testing of the slacks found blood belonging to the victim.  The trial court was directed to decide whether to order a new trial by determining if the postconviction DNA testing evidence was of such materiality that a reasonable probability existed that it would result in a different outcome at trial.  In Haddock II, the Kansas Supreme Court also affirmed the trial court's rejection petitioner's arguments for state habeas relief under K.S.A. 60-1507.  Some of these arguments are raised again in this action.

On remand, the trial court denied petitioner's request for a new trial based upon the postconviction DNA testing.  The court found that some of the testing results were favorable to petitioner, some confirmed evidence at trial, and some results were inconclusive.  It concluded that there was not a reasonable probability that the new evidence would have changed the outcome of the trial.  Using an abuse of discretion standard, the Kansas Supreme Court reviewed the finding of whether there was a reasonable probability of a different outcome.  The court affirmed the trial court's result.  It concluded that "reasonable people could agree that the postconviction DNA test

evidence was not so material as to make it reasonably probable there would be a different outcome." State v. Haddock, 286 P.3d 837, 839 (Kan. 2012)("Haddock III").

II. EVIDENCE AT TRIAL

The following review of the facts is taken almost completely from the opinion of the Kansas Supreme Court in Haddock III. Petitioner has expressed no objection to the Kansas Supreme Court's review of the facts and the court finds no grounds to stray from it after reviewing the record in this case. See Stouffer v. Trammell, 738 F.3d 1205, 1211 (10th Cir. 2013)(fact findings of the state court are presumed correct unless habeas petitioner presents clear and convincing evidence otherwise).

In November 1992, Barbara Haddock's body was discovered by her daughters under a pile of firewood in the garage of her Johnson County, Kansas home. The evidence indicated that Barbara Haddock had been beaten with a blunt object. She had defensive wounds on her hands and arms, bruises and lacerations on her face, and other wounds on her head. It appeared that the crime scene had been orchestrated by the perpetrator. Blood evidence showed that the victim's body was moved from one location in the garage to the woodpile in the garage. Her wounds were not consistent with wounds which would be suffered

4

if a woodpile had fallen on her. Tomatoes had also been splattered on the floor. Blood spatter evidence taken from her car indicated that the car was in the garage when the murder occurred. But, when the victim was discovered, the car was parked in the driveway. Thus, it appeared that the perpetrator moved but did not steal the car. There was no evidence of theft or burglary.

On the day of the murder, petitioner had been at the house after the noon hour and into the early afternoon. He testified that he left the house around 2:00 p.m. and travelled to the Olathe Public Library to do research related to a federal bank fraud case. Petitioner had been convicted in that case and was sentenced to prison. But, he was released on an appeal bond and was awaiting a resentencing hearing at the time of the murder. He testified that he left the library and travelled to a Wendy's where he purchased some food around 3:18 p.m. according to a receipt from the restaurant. Petitioner stated that, after stopping at Wendy's, he drove to look at some property which he was considering as an investment purchase. But, he overlooked the fact that property had already been sold. He then travelled to his office. His secretary had been requested to tell petitioner to go home immediately because his wife had been in

an accident.  Upon his arrival at the office, which was around 4:20 p.m., petitioner received this message.

The police found two fresh scratches on petitioner's right wrist.  Petitioner's shoes had wood chips in them.  A shirt and slacks belonging to petitioner was found on the floor near the laundry room and close to a door to the garage.  The shirt and slacks had blood on them.  So did the shoes petitioner was wearing.  The pattern of the blood indicated that the blood was spattered onto the slacks and shoes at the time of the beating as opposed to some point after petitioner returned home from the office.

The prosecution also presented evidence that the woodpile in the Haddocks' garage had fallen some time before the murder and that petitioner, his son and a few neighbors were the only ones who knew about it.  There was evidence that petitioner continued to advance the idea to relatives and friends that the victim's death was caused by firewood falling upon her even after he was told by police that the death appeared to be a homicide.

Petitioner argued in support of his alibi that the victim's watch was damaged during the beating and was stopped at 3:16 p.m.  As mentioned, petitioner claimed he was at Wendy's at 3:18 p.m. and before that was at the library.  The prosecution

6

presented evidence that the hands of the watch could have been manipulated and that the front desk clerks of the library did not recall seeing petitioner or anyone who looked like petitioner on the afternoon of the murder. Also, the victim's daughters arrived home around 3:20 p.m. or shortly thereafter, but saw nothing alarming until they discovered their mother, 30 to 40 minutes later. There was also evidence that around 2:00 p.m. a neighbor heard noise that she compared to the sound of wood being moved around and that the victim did not answer the phone when called at about 3:00 p.m.

As for evidence of motive, the prosecution proved that petitioner had been convicted in federal court of bank fraud, had appealed his prison sentence and convictions, and was on bond awaiting resentencing at the time of the murder. Originally, petitioner had been sentenced to 42 months in prison upon ten counts of conviction. The case was remanded for resentencing because two counts of conviction had been reversed and an issue of monetary loss required decision. There was testimony from a friend of the victim that Barbara Haddock would become upset and emotional when discussing the future, that she was worried about the expense of defending the case, and that she would get angry with petitioner because the case kept dragging on.

7

III.  POSTCONVICTION DNA TESTING

As mentioned, there was postconviction DNA testing on six items.  One of the items was a hair found in the victim's right hand.  At the time of trial there was some testimony regarding a relatively inexact DNA test which indicated that the hair was consistent with the blood of petitioner and inconsistent with the blood of the victim.  Postconviction, a more discriminating DNA test on the hair indicated that the hair came from a female and that it was inconsistent with the victim's DNA.

Postconviction DNA testing upon the fingernail scrapings showed the victim's DNA and no indication of any other source. Postconviction DNA testing upon a pair of eyeglasses showed DNA consistent with that of the victim, but also some extraneous DNA, possibly from a male source not consistent with petitioner.

Postconviction DNA testing upon petitioner's shoes showed a mixture of DNA with the victim as the primary donor.  The minor donor could not be identified but the DNA was consistent with petitioner.  Postconviction DNA testing upon petitioner's shirt was not conclusive.  The victim could not be excluded as the major donor of DNA found on the shirt.  Other tests conducted upon the shirt were positive for the presence of blood. Postconviction DNA testing upon petitioner's slacks was consistent with a female source.  Haddock II, 146 P.3d at 202.

8

IV.  STANDARDS OF REVIEW

The standards this court must apply when reviewing petitioner's § 2254 challenge to matters decided in state court proceedings were set forth in Frost v. Pryor, 749 F.3d 1212, 1222-24 (10th Cir. 2014):

> Our review is . . . governed by AEDPA, which "erects a formidable barrier to federal habeas relief," Burt v. Titlow, --- U.S. ----, 134 S.Ct. 10, 16, 187 L.Ed.2d 348 (2013), and "requires federal courts to give significant deference to state court decisions" on the merits. Lockett v. Trammel, 711 F.3d 1218, 1230 (10th Cir.2013); see also Hooks v. Workman, 689 F.3d 1148, 1162-63 (10th Cir.2012) ("This highly deferential standard for evaluating state-court rulings demands state-court decisions be given the benefit of the doubt." (quotations omitted)).
>
> Under AEDPA, we may not grant a state prisoner's petition under § 2254 with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see also Harrington v. Richter, --- U.S. ----, 131 S.Ct. 770, 783-84, 178 L.Ed.2d 624 (2011).
>
> "Clearly established law is determined by the United States Supreme Court, and refers to the Court's holdings, as opposed to the dicta." Lockett, 711 F.3d at 1231 (quotations omitted). A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quotations omitted).

9

A state court decision is an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, J.); accord Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Richter, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). An "*unreasonable* application of federal law" is therefore "different from an *incorrect* application of federal law." Id. at 785 (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495 (opinion of O'Connor, J.)).

We may "issue the writ" only when the petitioner shows "there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. at 786 (emphasis added). Thus, "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." Id. "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" Titlow, 134 S.Ct. at 16 (quoting Richter, 131 S.Ct. at 786). Indeed, AEDPA stops just "short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Richter, 131 S.Ct. at 786. Accordingly, "[w]e will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." Titlow, 134 S.Ct. at 16 (quoting Richter, 131 S.Ct. at 786).

In making this assessment, however, "we review the district court's legal analysis of the state court decision de novo" and its factual findings, if any, for clear error. Byrd v. Workman, 645 F.3d 1159, 1165 (10th Cir.2011) (quotations omitted). Finally, our review is "limited to the record that was before" the

10

[state appellate court]. Cullen v. Pinholster, ---
U.S. ----, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557
(2011).

(footnote omitted).

V.   PETITIONER'S CLAIM OF A DUE PROCESS VIOLATION DOES NOT
WARRANT FEDERAL HABEAS RELIEF.

Petitioner's first claim for federal habeas relief is that
his due process rights were violated by the Kansas Supreme
Court's interpretation and application of the postconviction DNA
testing statute, K.S.A. 21-2512. Petitioner supports this claim
with three arguments.  In doing so, petitioner makes citation to
District Attorney's Office for the Third Judicial Dist. v.
Osborne, 557 U.S. 52 (2009) wherein the Court recited a limited
standard of review.  There, when examining the State of Alaska's
procedures for postconviction DNA testing, the Court stated
that:  "the question is whether consideration of Osborne's [due
process] claim within the framework of the State's procedures
for postconviction relief 'offends some principle of justice so
rooted in the traditions and conscience of our people as to be
ranked as fundamental,' or 'transgresses any recognized
principle of fundamental fairness in operation.'"  557 U.S. at
69 (quoting Medina v. California, 505 U.S. 437, 446, 448
(1992)).

A.   The Kansas Supreme Court's application of K.S.A. 21-
2512 does not violate principles of fundamental fairness
established by the United States Supreme Court.

Petitioner's first argument in support of his claim of a due process violation is that the Kansas Supreme Court improperly applied the provisions of K.S.A. 21-2512. Petitioner claims that once it was determined that the postconviction DNA testing results were "favorable" to petitioner, then the statute required that affirmative relief be ordered. The plain language of the statute, however, did not mandate this result, according to the Kansas Supreme Court. The statute has since been amended, but at the time of the Kansas Supreme Court's opinion it read in part as follows:

> If the results of DNA testing conducted under this section are favorable to the petitioner, the court shall: (A) Order a hearing . . . ; and (B) enter any order that serves the interests of justice, including, but not limited to, an order: (i) Vacating and setting aside the judgment; (ii) discharging the petitioner if the petitioner is in custody; (iii) resentencing the petitioner; or (iv) granting a new trial.

Thus, the statute allowed for an order of affirmative relief when the results of postconviction DNA testing were favorable to a petitioner, but it did not require such an order. It mandated a hearing and "any order that serves the interests of justice."

There is no principle of fundamental fairness cited by petitioner which requires a court to construe the term "including, but not limited to" as legally limiting a court to ordering affirmative relief. When "favorable" DNA testing

12

results are not so favorable under all of the circumstances of a case as to justify a new trial or other affirmative relief, then such relief is not "in the interests of justice."  If affirmative relief does not serve the interests of justice, then it should not be ordered.  We find that this interpretation of K.S.A. 21-2512 is within the plain language of the statute and is not contrary to any recognized principle of fundamental fairness.  See generally U.S. v. Ramos, 695 F.3d 1035, 1040 (10th Cir. 2012)("including" implies a non-exclusive list).

B.  The application of the abuse of discretion standard of review is not a clearly settled violation of due process.

Petitioner's second argument in support of his due process claim is that the Kansas Supreme Court violated petitioner's rights by applying an abuse of discretion standard when reviewing the trial court's finding that the postconviction DNA test results were material, but not so favorable that a reasonable probability existed that they would cause a different outcome at trial.  Petitioner contends that if the evidence is found to be material (and, we presume, "favorable" to petitioner), "that is the end of the analysis and Mr. Haddock is entitled to relief."  Doc. No. 6 at p. 22.  Petitioner further asserts that:

> In order to get relief under the abuse of discretion
> standard, Mr. Haddock would have to show that the
> state district court acted in an arbitrary and

13

capricious manner and that no reasonable person could
believe that Mr. Haddock would be found guilty again.
That standard seems to require . . . new evidence to
exonerate Mr. Haddock, which is explicitly not
required either by statute or by the Kansas Supreme
Court. Using an abuse of discretion standard deprives
Mr. Haddock of his right to vindicate his innocence
and will significantly and unconstitutionally limit
the ability of the wrongfully convicted to demonstrate
their actual innocence.

Id.

In order to justify affirmative relief, the Kansas Supreme
Court required that the postconviction DNA evidence create a
reasonable probability of a different outcome. Reversing a
trial court's application of this standard only when there is an
abuse of discretion does not violate a recognized principle of
fundamental fairness.

In federal court and Kansas state court, one of the factors
which must be shown in order to obtain a new trial on the basis
of newly discovered evidence is that "the new evidence would
probably produce an acquittal if a new trial were granted."
U.S. v. Orr, 692 F.3d 1079, 1099 (10th Cir. 2012) cert. denied,
133 S.Ct. 1300 (2013); State v. Laurel, 325 P.3d 1154, 1160
(Kan. 2014). An abuse of discretion standard is applied to
these decisions upon appellate review. U.S. v. Hill, 737 F.3d
683, 687 (10th Cir. 2013) cert. denied, 134 S.Ct. 1905 (2014);
State v. Laurel, supra. In the Tenth Circuit, if a new trial
motion is made on the basis of an alleged Brady violation, then

14

a de novo standard of review is applied to the determination of whether there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed.  See U.S. v. Reese, 745 F.3d 1075, 1083 (10th Cir.) cert. denied, 135 S.Ct. 235 (2014).  In Kansas state court, as the court recognized in Haddock III, a de novo standard is applied to the decision of whether the undisclosed evidence is material (and thus whether there was a Brady violation), but an abuse of discretion standard is applied to determining whether the Brady violation entitled the defendant to a new trial.  286 P.3d at 853 (citing State v. Warrior, 277 P.3d 1111 (Kan. 2012)).  This is consistent with case law from several circuit courts, as reviewed in Warrior, 277 P.3d at 1129.  But, it may not be consistent with Tenth Circuit law.

In any event, the standard of review announced by the Kansas Supreme Court is consistent with the standard of review for motions for new trial on the basis of newly discovered evidence.  Applying that well-established standard in this situation does not appear to violate a principle of fundamental fairness or to be fundamentally inadequate to vindicate petitioner's rights, particularly when the United States Supreme Court has held that the due process framework for determining Brady violations does not necessarily translate to the

15

postconviction procedures for DNA testing.  <u>Osborne</u>, 557 U.S. at 69.

Petitioner's citations to <u>Kyles v. Whitley</u>, 514 U.S. 419, 434-39 (1994) and <u>Trammell v. McKune</u>, 485 F.3d 546, 552 (10th Cir. 2007) are not persuasive because, first, they involve <u>Brady</u> violations, not claims of new evidence resulting from postconviction DNA testing.  Second, in this case and in <u>Kyles</u> and <u>Trammell</u>, a <u>de novo</u> review standard was applied to the issue of materiality.  So, one could argue that neither case clearly commands a different approach in this case.  One difference between this case and <u>Kyles</u> and <u>Trammell</u> is that there are different standards of materiality.  In this case, materiality was determined upon the basis of whether the postconviction DNA test results would have favorable probative value to a finder of fact.  <u>Haddock III</u>, 286 P.3d at 853 & 856.  For a <u>Brady</u> claim, materiality is demonstrated by proof that there is a reasonable probability that the undisclosed evidence would produce a different result.  <u>Kyles</u>, 514 U.S. at 434.  While this difference exists and a difference also exists as to whether a <u>de novo</u> or an abuse of discretion standard is applied to the determination of whether a reasonable probability of a different outcome has been proven, there has been no clear authority presented to this court to support a claim that the approach of

16

the Kansas Supreme Court is unreasonable or fundamentally unfair.

Petitioner asserts that in practice the abuse of discretion standard requires that he present evidence which exonerates him in order to obtain a new trial.  In the court's opinion, this is not the standard announced by the Kansas Supreme Court.  The problem with the postconviction DNA evidence in this case was not that it failed to exonerate petitioner, it was that it failed to substantially diminish the great amount of evidence indicating that petitioner orchestrated the crime scene in order to lead investigators away from the conclusion that he murdered his wife.  As the Kansas Supreme Court stated after a thorough review of the evidence:

> At trial and now, the State maintains that the key to the case is the orchestrated crime scene combined with evidence that only the family knew the wood pile had previously fallen, Haddock's insistence to police and his neighbors that the death was accidental and caused by the wood falling, and the movement of the car from the garage to the driveway after the beating.  The other compelling evidence includes Haddock's reaction to the crime, the wood chips in his shoes, the timeline, and the blood spatter evidence, which postconviction DNA testing reaffirms was formed by Barbara's blood.
> . . . .
> [H]ere only one piece of physical evidence that was relied on at trial, the hair, was discredited through postconviction DNA testing.  And, there is a significant amount of other evidence establishing Haddock's identity as the killer . . .
> While the evidence that the hair and eyeglasses had the DNA of two unknown people – one male and one

17

> female – could be used to suggest others may have also
> been present when Barbara was murdered, that evidence
> does not dispute the overwhelming evidence of
> Haddock's guilt to which the State and district court
> point. . .
>      In light of the evidence adduced at trial and
> through Haddock's second motion for DNA testing, we
> conclude that a reasonable person could agree with the
> district court's ruling that it is not reasonably
> probable the postconviction DNA testing results would
> change the jury's verdict that Haddock premeditated
> the murder of Barbara.

286 P.3d at 858-59.  This discussion does not suggest that the

Kansas Supreme Court required evidence exonerating petitioner in

order to find an abuse of discretion.

Finally, even if a _de novo_ review were applied, the court

would find, for the reasons explained in Haddock III, that the

postconviction DNA results were not so favorable to petitioner

as to create a reasonable probability of a different outcome at

trial.

C.  Considering an amended theory of the case was not a
clearly established violation of petitioner's due process
rights.

Petitioner's third argument in support of his claim of a

due process violation is that the prosecution should have been

precluded from arguing a new or amended theory of the case in

postconviction litigation.  Petitioner asserts that it was

unfair for the prosecution to contend, in light of the

postconviction DNA testing upon the hair in the victim's hand,

that the hair evidence was unimportant.  Petitioner argues:

18

> the court should not require more than that Mr.
> Haddock call into question the State's original case
> and the evidence it used – in other words, to
> "undermine the confidence in the outcome."  Nor should
> the court require more than the validation of Mr.
> Haddock's theory of defense that another person
> committed this crime, especially when he was denied
> the opportunity at trial.

Doc. No. 6, p. 24.  Petitioner further contends that it is unfair for the prosecution to present "an 'amended' version of the case in a venue where Mr. Haddock is at a disadvantage both as to the availability of resources to defend the amended case and the legal standards that are brought to bear in reviewing the amended case."  Id.

This argument must be rejected, first, because it does not provide grounds to find that the procedures followed in this case were contrary to fundamental fairness or were fundamentally inadequate to protect petitioner's rights to postconviction relief.  The approach followed in this case is not any different from the approach followed where a motion for new trial is made upon a claim of newly discovered evidence or ineffective assistance of counsel or prosecutorial misconduct.  In these situations, the prosecution is permitted to argue that there is no reasonable probability that the outcome of the case would have been different if the newly discovered evidence had been presented or the alleged mistakes of defense counsel had not been made or the alleged mistakes of the prosecutor had not

19

occurred.   The issue is not simply whether the evidence was favorable to the defense or whether the alleged mistakes were detrimental.

Second, petitioner does not identify what disadvantages he has faced which prevent him from "defending" the "amended case." Nothing is argued to convince the court that his situation is fundamentally unfair.

Finally, the Kansas Supreme Court carefully considered the DNA evidence (preconviction and postconviction) and the other evidence in the case.   It disagreed with petitioner's contention that the postconviction hair analysis "significantly weakened the State's case . . . and require[d] the State to develop a new 'central theme.'"   Haddock III, 286 P.3d at 857.   The court stated that the central theme of the prosecution remained the same, but that it was weakened by the postconviction DNA evidence regarding the hair in the victim's hand.   Nevertheless, the court concluded that "reasonable people could agree with the district court's assessment that this new evidence was not reasonably probable to change the outcome of the trial."   Id. The court reached this decision in part because the evidence at trial left open the possibility that the hair was the victim's or belonged to a third party, and that the prosecution did not emphasize the hair analysis during the trial or during closing

20

argument.   The state court's consideration and rejection of petitioner's argument is not unreasonable factually or legally. Therefore, it does not provide grounds for federal habeas relief.

VI.  PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL DO NOT WARRANT HABEAS RELIEF.

     A.   Standards governing ineffective assistance of counsel claims.

     In Bledsoe v. Bruce, 569 F.3d 1223, 1231 (10th Cir.) cert. denied, 558 U.S. 1081 (2009), the Tenth Circuit set forth the standards for considering an ineffective assistance of counsel claim:

> The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A claim of ineffective assistance of counsel "is an attack on the fundamental fairness of the proceeding." Id. at 697, 104 S.Ct. 2052. To establish an ineffective assistance of counsel claim, the defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. 2052.
> In determining if counsel's performance was deficient, we "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690, 104 S.Ct. 2052. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052.
> In determining prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." <u>Id.</u> at 694, 104 S.Ct. 2052. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695, 104 S.Ct. 2052.

B. <u>Petitioner has not shown ineffective assistance of counsel with regard to the physical evidence at trial</u>.

Petitioner's first argument in support of his ineffective assistance of counsel claim addresses his trial counsel's investigation of physical evidence.[1] Petitioner asserts that his counsel did not read and review the DNA report of Dr. Giles and that he did not fully investigate the exculpatory information contained in the report. In addition, petitioner claims that his counsel should have consulted his own DNA expert.

The Kansas Supreme Court held that petitioner presented no evidence that his trial counsel failed to read the Giles report. In addition, the court concluded that petitioner's trial counsel probably did read the report. This conclusion was drawn because of counsel's filing of a motion in limine regarding DNA evidence, his cross-examination of Dr. Giles, and his closing argument regarding the DNA evidence. <u>Haddock II</u>, 146 P.3d at

---

[1] The petition mentions as part of this claim that petitioner's trial counsel was ineffective because he failed to hire a shoeprint expert and failed to submit fingernail scrapings for DNA analysis. Doc. No. 1 at p. 6. These contentions are not argued in petitioner's memorandum in support of the petition. Because of the absence of legal and factual argument in support of the claims, they shall be denied.

215.   Petitioner has failed to dispute the reasonableness of this analysis.

The Kansas Supreme Court further held that the decision not to seek independent DNA testing was a reasonable tactical choice and not ineffective assistance of counsel.  Id.  This is not an arbitrary judgment.  Petitioner's trial counsel was able to argue to the jury that the DNA hair analysis was not the most exact procedure and, instead, a "one in twenty method."  Id. Counsel could not have known in advance what the results of independent testing would be.  Counsel could have feared that the results would be inculpatory.  If the results were not inculpatory, the prosecution could always diminish their importance by noting that the victim was found in a garage and that her body had been handled by neighbors and emergency medical personnel who attempted to resuscitate her before the police arrived at the scene.  The risk/reward calculation made a decision to forego independent DNA investigation a reasonable tactical choice.  See Cummings v. Sirmons, 506 F.3d 1211, 1223 n.2 (10th Cir. 2007) cert. denied, 554 U.S. 907 (2008)(failure to request DNA testing upon hair was not ineffective assistance of counsel); Thompson v. Cain, 161 F.3d 802, 813-14 (5th Cir. 1998)(failure to do independent ballistics tests was not ineffective assistance of counsel); Battle v. Delo, 19 F.3d

23

1547, 1556-57 (8th Cir. 1994)(failure to obtain blood and saliva samples from a possible suspect was not ineffective assistance); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997)(failure to have blood on a carpet tested was not ineffective assistance); Garner v. Harry, 2006 WL 3371128 *13 (E.D.Mich. 2006)(failure to obtain DNA test on semen was not ineffective assistance in defending a rape charge).

In addition, the Kansas Supreme Court determined that a reasonable person could conclude that the postconviction DNA analysis probably would not have altered the outcome of the trial.  We agree with this finding.  It is reasonable to extend the analysis to find that any alleged error in failing to conduct independent DNA analysis prior to trial did not prejudice petitioner's case at trial because it does not undermine confidence in the trial's result.

C.  Petitioner has not shown that his trial counsel was ineffective when he failed to impeach Sherry Benn's testimony.

Petitioner argues that his trial counsel was constitutionally ineffective because he failed to impeach Sherry Benn's testimony with her statements to the police.  Ms. Benn testified that she called the victim between 1:30 and 2:00 p.m. on the day of the murder and spoke with her for no more than five minutes.  She further testified that the victim told Ms. Benn that petitioner had come home for lunch, but she did not

24

say whether he had left before Ms. Benn called.   There is a police report, however, that Ms. Benn told a Detective Pike on the day after the murder that the victim said petitioner had left just before Ms. Benn called.   At trial, petitioner's counsel asked Ms. Benn whether she made this statement to Detective Pike and Benn denied doing so.   Petitioner's counsel did not attempt to impeach Ms. Benn's testimony by introducing the report as evidence.

The Kansas Supreme Court found that any error committed by petitioner's trial counsel by failing to impeach Ms. Benn's testimony did not make a difference in the trial.   Haddock II, 146 P.3d at 221.   The court reasoned that Ms. Benn was vague as to the time of her call.   The court also noted that one witness saw petitioner getting mail at the community mailbox around 2:00 p.m. and another witness said petitioner's van was parked in the driveway around 2:00 p.m.   The court suggested that, if Benn's alleged statements to Detective Pike were accurate, the victim could have meant that petitioner left to get the mail, but later he returned.   We find the state court's evaluation of possible prejudice to be reasonable.   A reasonable jurist could decide that any inconsistency in Benn's statements was minor and that the failure to impeach Benn on the witness stand did not cause petitioner prejudice.

D.   Petitioner has not shown that his trial counsel's failure to object to closing argument was ineffective assistance of counsel.

Petitioner contends that his trial counsel rendered ineffective assistance of counsel because he failed to object to the prosecutor's closing argument when the prosecutor told the jury that petitioner had lied about the clothes he wore on the day of the murder.[2]   The Kansas Supreme Court determined that the prosecutor's comments were improper under Kansas law and that petitioner's counsel was deficient in failing to object to the improper comments at trial.   Haddock II, 146 P.3d at 220.

---

[2] The alleged improper comments, as set forth in petitioner's brief, were:

> Why, ladies and gentlemen, why would you lie about that sort of thing?   I would contend to you that we had one very bright, intelligent defendant, who has sat here throughout the entirety of this case, listened to every witness that has come through the door, and weighed and gauged, just so he could weave his story to fit the facts in this case, and he's had to change his story in a way that he feels is going to be most palatable to you as jurors.

> Why are we lying about the sweater?   Well, again, the clothes, ladies and gentlemen, are the key to this case.   The clothes are the key to this case.

> The reason that he's lying about the clothing and the reason he's trying to play a confusion game with you, ladies and gentlemen, about the clothes is because he wants like heck for you to buy the notion that he did not wear those pants on November the 20th.

> You can alter a watch.   You can alter a pile of logs.   You can pull a vehicle out, and you can do a lot of lying afterward to try to cover your tracks, but you can't alter what's contained on the pair of pants and you cannot alter what's contained on those shoes.

Doc. No. 6 at p. 30.

But, the court also found that the comments reflected "a miniscule part of a 5-day trial and were likely to have little weight in the minds of the jury." Id. This was because "whether the jury believed the defendant's reasons for changing clothes over the lunch hour or not, this did not change the overwhelming circumstantial evidence of the defendant's guilt presented at trial, even if we exclude the DNA evidence from our consideration." Id. We conclude that a reasonable jurist could reach the result set forth in these findings by the Kansas Supreme Court.

In addition, we note that habeas relief has been denied in similar cases where there have been claims of prosecutorial misconduct. In Bland v. Sirmons, 459 F.3d 999, 1025 (10th Cir. 2006) the court denied relief where the prosecution referred to defendant as a liar on account of differences between defendant's testimony and other evidence in the case). Also, in Donaldson v. Roberts, 2009 WL 1158668 *8-11 (D.Kan. 4/28/2009), this court held that a prosecutor's stated opinions at trial as to the petitioner's veracity did not warrant habeas relief. As in those cases, petitioner's trial counsel's alleged deficiencies in this case were not so severe as to undermine a reasonable person's confidence in the outcome of the trial.

Therefore, the court shall reject this argument for federal habeas relief.

E. Considered cumulatively, counsel's alleged errors were not so prejudicial as to warrant habeas relief.

At the close of petitioner's ineffective assistance of counsel argument, petitioner claims that, when considered cumulatively, that his trial counsel's errors were prejudicial to his defense. The court has considered petitioner's arguments carefully. We conclude that, absent the alleged errors, there is not a reasonable probability that the result of the trial would have been different.

VII. PETITIONER'S CLAIM THAT THE PROSECUTION IMPROPERLY COMMENTED UPON HIS EXERCISE OF HIS RIGHT TO REMAIN SILENT DOES NOT WARRANT HABEAS RELIEF.

Petitioner argues that he is entitled to postconviction relief because the trial court improperly permitted the prosecution to comment upon his exercise of his right to remain silent after receiving a Miranda warning. This allegedly occurred when the prosecutor asked petitioner during cross-examination whether he had told the police or neighbors that he had taken his shirt off when he was home for lunch. This was in response to petitioner's testimony on direct examination that he had taken his shirt off at lunchtime so his wife could replace a missing button.

The question to which petitioner refers is:

28

> Would you agree, sir, that this is the first time this
> week that we've heard you indicate to anybody that you
> took that shirt off while you were home, because your
> wife thought there was a button missing, and she
> wanted to take care of it for you?

Doc. No. 6 at p. 32.

The Kansas Supreme Court rejected petitioner's argument on direct appeal of his conviction on the grounds that the prosecution was referring to petitioner's statements made before he was in custody and before he was given a <u>Miranda</u> warning. The court explained:

> We do not think the jury likely or necessarily
> would have interpreted the prosecutor's question as a
> comment on Haddock's silence.  Rather, the statement
> was likely interpreted as a reference to prior
> witnesses' testimony heard earlier that week [at
> trial]. . . [D]uring the State's case, several people
> including Frank Hartley, Officer Ridley, and Detective
> Larue, had testified about statements they heard
> Haddock make about his clothing on the night of the
> murder. . . .
> In the present case, Haddock talked to police and
> others at length.  The challenged question by the
> prosecutor was a reference to Haddock's failure to
> tell police and others the same explanation that he
> gave at trial.

<u>Haddock I</u>, 897 P.2d at 161.  In support of this finding the court noted that the prosecutor said in response to petitioner's objection at trial that petitioner had made several statements to people and that when the prosecutor repeated his inquiry he phrased the question as follows:

> My question was:  Did you ever mention to any of the
> neighbors, Frank Hartley, Joenne [sic] Bate, or

anybody else or Sergeant Ridley, who asked you about your clothing situation, anything about having removed that shirt because your wife wanting to do some work on it?

Id. at 160.

In Doyle v. Ohio, 426 U.S. 610 (1976), the Supreme Court held that a prosecutor may deprive a criminal defendant of his right to due process by making improper comments about his post-Miranda silence.  In Battenfield v. Gibson, 236 F.3d 1215, 1225 (10th Cir. 2001), the Tenth Circuit said  that "the question is whether the language used by the prosecutor was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." (interior quotations omitted).

Unlike Doyle and Battenfield, in this instance the Kansas Supreme Court held that the prosecutor's statements were referring to petitioner's pre-Miranda silence.  Upon review of the trial transcript, the court finds that this is a reasonable position.  Consequently, the prosecutor did not violate petitioner's right to due process.  See Bland, 459 F.3d at 1022-23 (closing argument which questioned why defendant did not claim self-defense prior to trial when he made statements to his mother and law enforcement referred only to pre-Miranda silence and did not violate due process).

30

Petitioner further contends that the prosecutor improperly referred to petitioner's post-Miranda silence in a series of questions relating to whether petitioner expressed concern for his children's safety during the evening after the murder when he spoke with investigators or later that week before his arrest.   The prosecutor made a similar comment during closing argument.

Respondent argues that this claim must be rejected because petitioner failed to object to the questions and comments at trial.   This was one reason the Kansas Supreme Court rejected petitioner's claim on direct appeal.   Haddock I, 897 P.2d at 161.

The United States Supreme Court has stated that "a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court has declined to address those claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds."   Maples v. Thomas, 132 S.Ct. 912, 922 (2012)(interior quotations omitted). In this instance the state procedural rule requiring an objection to preserve an issue for appeal is an "independent" ground because it is based upon state law and it was relied upon by the state supreme court.   See McCracken v. Gibson, 268 F.3d

31

970, 976 (10th Cir. 2001) cert. denied, 537 U.S. 841 (2002).
State procedural grounds are "adequate" if the state procedural
rule is strictly and regularly followed and applied evenhandedly
to all similar claims. Banks v. Workman, 692 F.3d 1133, 1145
(10th Cir. 2012) cert. denied, 133 S.Ct. 2397 (2013). In Kansas,
the rule requiring a timely objection to evidence in order to
overturn a verdict is strictly and evenly applied. See Torres
v. Roberts, 253 Fed.Appx. 783, 787 (10th Cir. 2007)(Kansas
preservation rule is an independent and adequate state law
ground to default claims); Carr v. Koerner, 120 Fed.Appx. 772,
775-76 (10th Cir. 2005)(same, citing K.S.A. 60-404). The only
exception to the denial of review of procedurally defaulted
claims is when petitioner demonstrates cause for the default and
actual prejudice, or alternatively demonstrates a fundamental
miscarriage of justice. McCracken, 268 F.3d at 976.

Petitioner has offered no grounds for the court to find
that either 1) he objected to the questions or closing argument
at trial; or 2) that the state procedural rule requiring an
objection to preserve an issue on appeal is not an independent
and adequate state procedural requirement. Further, petitioner
does not argue that there is cause or prejudice excusing the
failure to object at trial or that a review of petitioner's

argument is necessary to prevent a fundamental miscarriage of justice.

For the above-mentioned reasons, the court shall refuse to grant relief upon petitioner's claims that the prosecutor improperly commented upon his exercise of the right to remain silent.

VIII. PETITIONER'S CLAIM THAT THE TRIAL COURT SHOULD HAVE GRANTED HIS MOTION TO SUPPRESS THE ENTIRETY OF HIS STATEMENTS TO THE POLICE DOES NOT JUSTIFY HABEAS RELIEF.

Petitioner's final argument for relief asserts that the trial court erred by refusing to suppress the entirety of petitioner's custodial interrogation. According to the facts recited in Haddock I, petitioner was interrogated by the police from 7:40 p.m. until 1:25 a.m. at the police station. There were at least two breaks during the interrogation which served to divide it into three parts. The first part was ruled admissible. Most of the second part and all of the third part were ruled inadmissible on the grounds that petitioner had invoked his right to an attorney.

At the start of the interrogation, petitioner was warned that he had the right to talk to a lawyer and to have a lawyer present while he was being questioned. Petitioner responded by stating that he understood and asking "is there any reason for me to?" The officer replied, "Not at this point, I don't."

33

Petitioner then said, "Okay."   According to the Kansas Supreme Court in Haddock I, 897 P.2d at 162, petitioner was advised that if he could not afford to hire a lawyer, one would be appointed to represent him during questioning if he wished.   Petitioner was also advised that he could decide at any time to exercise his rights under Miranda.   Petitioner said that he understood. The police further told petitioner that he was not in custody and could leave at any time.   At the conclusion of the interview, petitioner did leave the police station.   He was not arrested until several days later.

In this federal habeas challenge, petitioner advances two arguments for suppression.   First, petitioner asserts that the detective made a misleading response to his question of whether there was a reason to talk to a lawyer.   Petitioner, however, does not explain why he was misled by the detective's answer or why the trial court erred by finding that the response was not misleading.   Upon review, the court concludes that petitioner has not shown that the trial court's findings were unreasonable. If petitioner was not threatened or deceived into waiving his rights to self-incrimination, then he rendered a knowing and voluntary waiver of his Miranda rights.

Petitioner's second argument for relief is that the police did not honor the guarantees made in the Miranda warning.   In

essence, petitioner asserts that although the police promised petitioner that he had a right to have an attorney present, they did not respect this promise during the interrogation. This argument must fail for the following reasons. First, the police were not bound to consider petitioner's question at the start of the interview as an invocation of his right to counsel. As the Court explained in Berghuis v. Thompkins, 560 U.S. 370, 381 (2010):

> In the context of invoking the Miranda right to counsel, the Court in Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), held that a suspect must do so "unambiguously." If an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation, ibid., or ask questions to clarify whether the accused wants to invoke his or her Miranda rights, 512 U.S., at 461–462, 114 S.Ct. 2350.

Second, petitioner was not in custody when his interview was initiated, therefore, he had no constitutional right to stop the questioning until counsel could be appointed. U.S. v. Bautista, 145 F.3d 1140, 1149 (10th Cir.) cert. denied, 525 U.S. 911 (1998). Petitioner asserts that the totality of the circumstances suggests that petitioner was not free to go whenever he wanted. But, the state trial and appellate courts have concluded otherwise and, upon review, their holdings are not unreasonable. Cf., Oregon v. Mathiason, 429 U.S. 492 (1977)(interview in a police office of a suspect who is told he

is not under arrest is noncustodial); U.S. v. Cota, 953 F.2d 753 (2nd Cir. 1992)(interview after a 6-hour stay at a police station following a traffic stop where the suspect's car was seized and the suspect was initially handcuffed, was considered noncustodial because suspect was told she was not under arrest and it was her choice not to leave); U.S. v. Ellison, 791 F.2d 821 (10th Cir. 1986)(interview in a U.S. Attorney's office of a suspect who had been driven to the interview by the police and told he was not under arrest and was informed that he did not have to answer questions and had the right to have an attorney present, was not custodial).

Finally, petitioner cites no clear and controlling legal authority to support his claim that he invoked his right to counsel prior to making the statements that were admitted at trial, and that he did so effectively, given that he was not in custody.

For these reasons, the court rejects petitioner's final contention for habeas relief.

IX. CONCLUSION

Upon due consideration, the petition for relief pursuant to 28 U.S.C. § 2254 shall be denied.

XI. CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473 (2000)(citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). The court concludes that a certificate of appealability should not issue in this case. Nothing suggests that the court's rulings resulting in the dismissal of this action for failure to state a claim for federal habeas corpus relief are debatable or incorrect. The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

**IT IS THEREFORE ORDERED BY THE COURT** that this petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is denied.

**IT IS FURTHER ORDERED** that a certificate of appealability is denied.

**IT IS SO ORDERED.**

**Dated this 29th day of December, 2014, at Topeka, Kansas.**

**s/Sam A. Crow**
**U. S. Senior District Judge**